In the Matter of George H. Eberle, Respondent, against Fiorello H. LaGuardia et al., Constituting the Board of Estimate of the City of New York, as Trustees of the New York City Employees' Retirement System, et al., Appellants.

Argued January 20, 1941; decided April 17, 1941.

*William C. Chanler, Corporation Counsel (Jeremiah M. Evarts* and *Paxton Blair* of counsel), for appellants.

*Moses Altmann* for respondent.

FINCH, J. The question presented by this appeal is whether the Legislature by provisions of the Administrative Code of the City of New York (effective January 1, 1938) has authorized the Board of Estimate to grant the application for payment of a pension to a person who has been removed from his position as a member of the city service on charges involving fault and delinquency which he has not disproved.

The facts are not in dispute. The petitioner was in the city service for forty-three years and at the time of his

dismissal occupied the position of chief clerk to the Municipal Civil Service Commission. He had been a member of the Retirement System since its inception in 1920 and had attained the minimum retirement age, namely, sixty, of the group of which he was a member. On April 4, 1939, he was suspended from his position pending the filing of formal charges as follows: (1) that he had delayed payment of moneys due to the city; (2) that his accounts were in a confused and disordered state; (3) that there was a substantial shortage in his accounts; and (4) that he had failed to report the shortage and the confused state of his accounts to his superiors. On April 12, 1939, a bill of particulars showing a net cash deficit of $1,300.48 in his accounts, subsequently raised to $2,929.77, was served upon petitioner and a hearing set for April 18, 1939.

On April 17, 1939, while the charges were pending and the day before they were to be heard, the petitioner filed with the Board of Estimate his written application for retirement from the city service. Pursuant to his request at the hearing, petitioner on April 19, 1939, sent a letter to the Commission setting forth his defense to the charges. On April 20, 1939, the Commission found the petitioner guilty of the above charges. Petitioner thereupon was dismissed from the service and his name removed from the civil service rolls. The propriety of this dismissal by the Commission has never been attacked by the petitioner.

The Board of Estimate, on December 14, 1939, granted the petitioner's application for retirement. It later reconsidered the resolution after the Mayor, who had not been personally present when it was passed, disapproved. On reconsideration by the Board of Estimate, the pension was denied by a vote of fourteen to two. The question of the right of the Board of Estimate to reconsider its original resolution is not presented here but rather the right of the Board to pass the resolution in the first instance.

This is a proceeding brought by the petitioner to compel the Board of Estimate as the Trustees of the Employees' Retirement System to grant his application for retirement and to determine the amount of his retirement allowance. It is respondent's position that he was a member in the city

service at the time that he filed his application for retirement. Since he had attained the minimum retirement age, he contends that notwithstanding his dismissal for fault and delinquency three days after he filed the application, the Board of Estimate must grant such retirement allowance and its action in so doing is purely ministerial. His position is based upon his interpretation of section B3–36.0 of the Administrative Code (L. 1937, ch. 929) and rule 58 of the Rules of the Board of Estimate.

Petitioner did not apply for retirement until after he had been suspended and charges involving fault and delinquency had been filed against him. Upon those charges he was removed from the city service and this removal took place before the earliest date on which the Board could or did act upon his application. Under the provisions of the Administrative Code formerly contained in the Charter of the City of New York (L. 1901, ch. 466, as amended) the members of the retirement system are entitled to certain rights, which rights have been characterized as being in the nature of contractual or quasi-contractual rights. (*Roddy* v. *Valentine*, 268 N. Y. 228, 231.) Where the statutory conditions for retirement have been met those rights become vested and payment of the pension cannot be withheld in the absence of fault or delinquency at the mere whim of any administrative officer or body. (*Rees* v. *Teachers' Retirement Board*, 247 N. Y. 372; *People ex rel. Fitzpatrick* v. *Greene*, 181 N. Y. 308, 312.) In the case at bar the question presented is whether these rights include retirement allowance for a prior member of the system who has been suspended from the service upon charges before his application for retirement was made and where the charges have been sustained and the member dismissed from the service before the date set in the application for actual retirement. Under these circumstances have the statutory conditions been met?

Section B3–36.0 of the Administrative Code, upon which the petitioner relies, provides that " any member in city-service may retire upon written application to the board setting forth at what time, not less than thirty days subsequent to the execution and filing thereof, he desires to be

retired, provided that such member *at the time so specified for his retirement* shall have attained the minimum age of retirement provided for the group of which *he shall be a member at such time.* * * *" (Italics interpolated.) The statutory conditions for retirement are entirely clear. The applicant must (1) have attained the minimum age of retirement, and (2) he must be a member of the city service at the time so specified for his retirement. It is obvious that an applicant could not be " retired " from the service if prior thereto he has been removed. In the case at bar, the petitioner has failed to comply with this second requirement.

Since the application for retirement in this case was not filed until April 17, 1939, it could not become effective or be acted upon by the Board of Estimate until at least thirty days after that date. Before May 17, 1939, the petitioner had been involuntarily removed from the city service. Under section B3–36.0, the petitioner, having been removed from the service before his application became final, has no right to a pension. The effect of the petitioner's dismissal from the city service is the same as if he had died before the effective date of his application. In such case the right to a pension is lost. (*Matter of O'Brien* v. *Tremaine*, 285 N. Y. 233; *Matter of Creveling* v. *Teachers' Retirement Board*, 255 N. Y. 364.) Following this principle, we held in *Matter of McMeekan* v. *Dept. of Health of the City of New York* (157 Misc. Rep. 620; affd., 249 App. Div. 609; affd., 274 N. Y. 521) that voluntary retirement was not effective until the Board of Health by resolution approved. In that case, petitioner, an employee of the city, having learned that charges were to be preferred against him filed his application for retirement. The next day he was suspended and thereafter dismissed upon charges. To the same effect, see *Matter of Murnane* v. *LaGuardia* (242 App. Div. 823).

The petitioner contends that the defect in his application is remedied by rule 58 of the Rules of the Board of Estimate which provides that " the rights of an applicant to retirement shall not be forfeited by separation from service or other change in status subsequent to the filing of an applica-

tion for retirement . * * *." The language of this rule would not seem inconsistent with the provisions of the Administrative Code. It would seem to refer to acts which might lead to removal occurring subsequent to the filing of the application. If, however, its language is inconsistent it cannot stand. A mere rule must give way to an act of the Legislature.

It is submitted that the above construction of section B3–36.0 would seem to follow from reading the retirement law as a whole. The petitioner having served upwards of forty years, the provision of the retirement law under which he normally would make application would be section B3–35.0 which applies to twenty years or more of service. But this petitioner is expressly excluded from section B3–35.0 because he was removed from his position for fault and delinquency. Therefore he has applied for a pension under section B3–36.0 which he contends permits retirement in spite of removal for fault or delinquency. If we sustained that contention, the result which we would adopt would allow a member of the city service who had attained the minimum age to compel the payment of a pension to him after dismissal from the service no matter how serious the charges filed against him and even though his city service falls far short of twenty years, whereas a member of the service who had completed twenty years of service and had been removed therefrom upon charges would have no right to a pension. It would not seem that the Legislature intended to produce so inconsistent a result. It is unnecessary, however, to pass upon this question for the reason as already noted that the petitioner had been properly removed from the service before his application became final and hence has no right to a pension.

It has been urged by the petitioner that the deductions from his salary and the expected benefits of the retirement plan constituted a part of his compensation during his tenure of office and that to deprive him of such benefits now would deprive him of compensation which has already been earned. Since the petitioner was not in the service of the city at the time his application for retirement became final he is not entitled to a pension under section B3–36.0

but may recover his accumulated deductions from salary under section B3-29.0 which provides for such payment in all cases except death or retirement. Even though a member be removed for fault or delinquency he is still entitled under section B3-29.0 to the accumulated deductions. Thus there arises no forfeiture and petitioner is in no way penalized.

Petitioner also urges that he has an adequate defense to the charges made against him and upon which he was dismissed. Such question is not before us upon this appeal. The propriety of his dismissal is reviewable only upon a petition for reinstatement under article 78 of the Civil Practice Act. Nor does the fact that petitioner has made restitution of a part of the amount of the shortage found in his accounts alter the character of the charge. Restitution cannot be considered as a criterion for the purpose of the determination of whether the charge involves fault or delinquency. Until the petitioner's dismissal has been set aside upon review by the courts, the finding of the Commission that petitioner was guilty of fault and delinquency is conclusive upon this court for the purposes of this appeal.

It follows that the orders should be reversed and the petition dismissed, without costs.

RIPPEY, J. (dissenting). Respondent entered the service of the Municipal Civil Service Commission of the City of New York as junior clerk on March 4, 1896, at the age of eighteen years, as the result of being chosen from a civil service list for that position. After advancing through several grades of service, he was finally promoted to the position of chief clerk on July 1, 1910, which position he held until April 4, 1939, when he was handed a letter from the President of the Civil Service Commission stating that he was suspended without pay pending the filing of formal charges on certain counts involving alleged inefficient performance of the duties of his office and lack of co-operation with his superiors. Up to the last-mentioned date he had rendered continuous faithful service to the Municipal Civil Service Commission for a period of more than forty-three

years without complaint. After an alleged hearing before the President of the Commission who himself had made the charges, the Commission found him guilty on the first four counts on April 20, 1939, and he was dismissed from the service and his name stricken from the civil service rolls. Thereupon certification of such dismissal was sent to the Comptroller and to the New York City Employees' Retirement System. On April 17, 1939, while still in the city service and having passed the voluntary retirement age, he filed an application for service retirement under section B3-36.0 of the Administrative Code with the Board of Estimate. The application came before the Board on May 4, 1939, was on the calendar several times and was finally granted on December 14, 1939. By resolution of the Board the petitioner was retired to take effect as of May 17, 1939, subject to subsequent determination and fixation of the amount of his service retirement allowance. At the request of the Mayor the Board rescinded that resolution on December 22, 1939, and, on January 11, 1940, the Board denied the application. Petitioner thereupon brought this proceeding under article 78 of the Civil Practice Act to compel the Board to grant retirement and fix the allowances to which he was entitled, according to the applicable provisions of the Administrative Code. The motion was granted and, on appeal from the order granting that relief, the Appellate Division affirmed.

The issue of the correctness of the dismissal of respondent from the city service is not here. Nevertheless, the entire record in that connection is a part of the record in these proceedings and is claimed to have some bearing upon matters to be here decided. The charges were, in substance, (1) that he had delayed payment of moneys due the city on behalf of the Commission, (2) that his accounts were in a confused and disordered state, (3) that substantial shortages existed in such accounts, (4) that he had failed to report to his superior the existence of such confused and disordered accounts and the existence of such shortages, and (5) that he had failed to include in the budget request for 1939–1940 a request for the filling of the vacancy of $3,300 left by John C. Lapham, clerk of the Commission, a transfer.

On April 12, 1939, a bank reconciliation statement as of April 7, 1939, was transmitted to respondent showing a net cash deficit of $1,300.48 as of that date and, upon the foregoing charges as supplemented by that statement, he was directed to appear before the Commission for a hearing on April 18, 1939. Respondent appeared on the date mentioned. He had previously written to the President of the Commission and asked for a postponement of the hearing, and when he appeared he orally renewed the request to enable him to prepare a defense. On April 18th the President of the Commission and respondent had a running conversation which, as the Justice at Special Term pointedly stated, " To call it a trial, would be a travesty." (175 Misc. Rep. 272, 275.) It was also pointed out at Special Term that the charges were inconsequential except possibly the charge of shortage and the respondent advised the President of the Commission at the so-called hearing that he had already seen that the item of alleged shortage was deposited in the bank account. No additional shortage was called to his attention nor was he given any opportunity to check up with the Comptroller prior to his summary dismissal from the city service. At the end of the so-called hearing he was given until noon of April 20th to present to the Commission in writing whatever defense he wished to present. He sent a letter to the Commission on April 19th in which he clearly pointed out, as to charges 1 to 4 inclusive, that the reports to the Comptroller of fees, etc., collected in his office could not be prepared until the close of business at the end of each month, that whatever delays had occurred were due to the inability of the employees of his office to sort and tabulate the large quantity of documentary receipts at hand and that whatever delay had occurred in making returns to the Comptroller was due to the failure of the Commission to furnish sufficient employees promptly to handle that and other duties required of them. The great mass of work required by an insufficiently large office force was detailed and attention was called to the recent filing of applications and fees for 33,000 patrolmen candidates which took at least six weeks to tabulate and complete. Respondent asserted that deposits were made daily at the National City Bank

except for certain sums withheld for the purpose of making change, that the accounts were not in a confused or disordered state, that he had promptly checked and deposited in the bank the moneys of the alleged shortage of $1,300.48, that at various dates during 1937 and 1938 he had submitted reports and recommendations to the Commission suggesting improvements in the methods of collecting fees and of accounting therefor by the office, including the installation of a cash register to aid in the efficiency of the work and that the application bureau had also called attention without result to the difficulty in expeditiously and properly handling and tabulating fees received. The trivial character of the charges was clearly indicated in the reply to the fifth charge where it appeared that the reason why omission had been made in filling the vacancy was that the President of the Commission himself in submitting the departmental request to the Director of the Budget, had asked approval of certain salary increases for employees of the Commission whereby the funds required for that purpose were the same funds as would have been required for the filling of the vacancy. The Commission thereupon dropped that charge. There is no claim in this record that Eberle took any money belonging to the city of New York and without that there could be no personal " fault or delinquency " in connection with any alleged shortage. He has not been charged with larceny or with any other crime. As head of the department, he would, of course be required to make good any losses even though the losses were caused by subordinates and he knew nothing about them. As the Comptroller's office pointed them out, so far as they appeared to exist they were promptly made good.

The New York City Employees' Retirement System was established on an actuarial basis on October 1, 1920, and is subject to the supervision of the State Department of Insurance (L. 1920, ch. 427; Administrative Code, ch. 3, tit. B, §§ B3–1.0 to B3–53.0). The relative statutory provisions are, in detail, complete and all comprehensive. The system is a separate and distinct entity with all the powers and privileges of a corporation (§ B3–10.0). Various funds for various purposes are made up from compulsory contributions

from its members during city service, from the city, from public benefit corporations and from profits from interest and from investments, from which, according to circumstances, loans are to be made and member accumulations, death benefits, disability benefits, retirement allowances and pensions in amounts fixed by statute must be paid. Such benefits, allowances and pensions are not gratuities: they are based on strictly defined legal rights. The system maintains its own actuary, medical board, secretary and other necessary employees. The members of the Board of Estimate are trustees of the various funds with the direction, control, disposition, investment and management thereof and with other definitely defined duties and obligations. The Comptroller of the city is the custodian of the funds and disbursement can be made by him only upon vouchers by the secretary of the system.

Membership in the system of city employees covered by the system is compulsory. Members of the system are classified into groups. Eberle was grouped in class 3. He became a member of the system on October 1, 1920. Such a membership has been continuous and has not been suspended or terminated. Involuntary terminations from city service is one thing; termination of membership in the retirement system is quite a different proposition. By specific provisions of the statute, membership could terminate only on the happening of one or more of the events provided for in section B3–31.0 and, so far as Eberle is concerned, none of these events have occurred. His membership in the system could not be involuntarily terminated under the provisions of the act until he had received all the benefits to which he was entitled. However that may be, his membership in the system in no event could terminate or be involuntarily terminated by the express provisions of the act until he " shall be retired on a pension " (§ B3–31.0, subd. 6). He has not been retired on a pension and he cannot be retired for service on a pension until the Board of Estimate has, on his written application, in fact, retired him (§§ B3–36.0; B3–42.0; B3–46.0). Hence he was still a member of the system when and after he was found guilty on the charges filed against him and dismissed from city service.

His application for retirement was filed with the Board on April 17, 1939, under section B3–36.0. It is claimed that the Legislature prohibited *service retirement* to any member of the system who has been removed for a cause involving fault or delinquency on his part and that such a prohibition must be read into that section. Reliance for that idea is based on the provisions of section B3–35.0 of the Code. Any such contention cannot be maintained as even the merest cursory examination of the provisions of the Code will clearly indicate.

If material to a discussion here, we have already pointed out the arbitrary manner in which Eberle's dismissal from city service was conducted and accomplished and that the notion that there was any personal fault or delinquency on his part could not be sustained. Nevertheless, the fact that he was involuntarily separated from city service, whether or not on the basis of fault or delinquency, has no bearing upon the decision in this case. Section B3–35.0 of the Code (p. 32) provides that " a member who is removed or otherwise involuntarily separated from city-service for any cause other than fault or delinquency on his part after having completed twenty years of allowable service, * * * shall receive in lieu of the benefit provided in section B3–29.0 of the code, as he may elect: 1. The amount of his accumulated deductions; or, in lieu thereof, 2. An annuity of equivalent actuarial value to his accumulated deductions, and, in addition, a pension beginning immediately," etc. Section B3–29.0, referred to in the above section, excludes termination of membership through discontinuance of city service *by death or retirement.* The retirement age for the group of which Eberle was a member was sixty years and he had arrived at that age more than a year previous to the date on which he filed his application. Section B3–36.0 (p. 33) provides: " Retirement of a member for service shall be made by the board as follows: 1. Any member in city-service may retire upon written application to the board setting forth at what time, not less than thirty days subsequent to the execution and filing thereof, he desires to be retired, provided that such member at the time so specified for his retirement shall have attained the mini-

mum age of retirement provided for the group of which he shall be a member at such time." Section B3-42.0 (p. 36) provides that " upon retirement for service a member shall receive a retirement allowance which shall consist of " certain specifically enumerated and definitely defined benefits to be received according, among other things, to length of service, and section B3-46.0 (pp. 38, 39) provides for certain options open for election by the beneficiary as to how he may desire to have such benefits distributed.

It is obvious that sections B3-29.0 and B3-35.0 have to do, as expressly provided, only with a particular class of city employees who are *involuntarily separated* from the city service without fault or delinquency after twenty years of allowable service in distinction to that class of employees who *may voluntarily retire* for service after reaching the minimum retirement age for their group under ·sections B3-4.0 and B3-36.0 of the Administrative Code. The two classes do not overlap. Between the two classes there is clear statutory distinction. The right to allowances of an employee involuntarily separated from the city service becomes fixed only after the city has acted to terminate this service, when there is left open to the Board of Estimate a certain field of discretion. An employee reaching the minimum service age for retirement may retire and his rights to benefits become fixed at his own option at the time he elects to be retired. If that were not so, the right to be retired under section B3-36.0 would be discretionary with the Board of Estimate. Sections B3-29.0 and B3-35.0 have no reference to voluntary retirement for service, while voluntary retirement for service is solely and specifically provided for in section B3-36.0. The latter section makes no reference to removal by the Board for or without fault or delinquency on the part of the member. The Board has no power to remove a member from service against his will under section B3-36.0, while under sections B3-29.0 and B3-35.0 the wishes of the member to leave the service need not be considered.

It is asserted, however, that there must be read into section B3-36.0 a limitation on the right to relief when the employee is *removed* or is *involuntarily separated from the*

*city service.* Such an addition to and limitation upon the provisions of the section would destroy its purpose. There is no such limitation expressed or implied in the statute, however, and we have no power to rewrite it to suit the occasion (*Sexauer & Lemke* v. *Burke & Sons Co.*, 228 N. Y. 341, 345). The rights of respondent are definitely and expressly fixed through the wisdom of those who legislated and may not here be modified or limited by fiat of those who construe. There is nothing ambiguous about the statutes under consideration. When we give attention to all the provisions relating to the retirement system, it seems clear that the expressed legislative intent and purpose were, among other things, to provide for relief to two separate and distinct classes of employees, each class being separately, clearly, without ambiguity and distinctly defined in the statutes themselves, which classes are unrelated in the specific cases to which they refer. So reading them makes sense and makes them serve their avowed purposes; reading them otherwise does not.

Sections B3–36.0 and B3–42.0 are largely self-executory and are mandatory since the former provides that retirement *shall* be made by the Board upon application by the employee who *may* make application for retirement if he attains the minimum age for retirement provided for the group of which he is a member and the latter provides that upon the member retiring for service the Board *shall* make him the allowance therein fixed. This court so construed provisions relating to retirement for service contained in the Teachers' Retirement System, parallel in scope and purpose to those in the Employees' Retirement System and, in applicable provisions, in identical words (Greater New York Charter, § 1092, L. 1901, ch. 466, as amd.; Administrative Code, §§ B20–41.0, B20–44.0, B20–46.0; *Rees* v. *Teachers' Retirement Board*, 247 N. Y. 372; *Matter of Creveling* v. *Teachers' Retirement Board*, 255 N. Y. 364; *Matter of Murray* v. *Teachers' Retirement Board*, 258 N. Y. 389). Refusal to follow well-considered judicial precedent is not ordinarily passed by without explanation. When Eberle went into the Retirement System, a compact was made whereby he might voluntarily retire for service and, at his option,

be voluntarily retired when he reached the age of sixty years and the Board of Estimate was mandated to grant him retirement allowances and pension rights according to the provisions of sections B3–42.0 and B3–46.0. No discretion was left to the Board of Estimate on the question of whether he could retire or could not be retired. Nor was any loophole left whereby a situation might be created by others by which any such discretion could be given to the Board. No strings were attached to his own absolute option to retire or be retired. When preliminary conditions authorizing retirement had been met, the pension rights became vested and beyond the power of the Board of Estimate or any one else to condition, curtail or deny (*Roddy* v. *Valentine*, 268 N. Y. 228). If, before such conditions had been fully met, pension rights were only an expectancy and subject to legislative change, it has never before been suggested that they might be changed, modified, curtailed or defeated by administrative fiat, whim or caprice or by judicial legislation. The *election to be retired* was the last remaining preliminary condition to mandatory action by the Board of Estimate to fix the amount of benefits to which Eberle was entitled under sections B3–42.0 and B3–46.0. There is nothing in the statute which indicates that the Board of Estimate was not mandated to act when his rights became finally vested. If he were required to wait until his pension rights were vested by action of the Board of Estimate, his right voluntarily to retire for service might be entirely defeated by no act of his own but by the act of an administrative agency in separating him from city service for disability or for fault or delinquency or perhaps for other reasons upon trumped-up and unfounded charges arbitrarily decided. The statute does not so read; no such legislative intent is expressed or inferable. Such a result can be reached only by construction, where there is no ambiguity or room for construction, or by judicial legislation through the transfer into section B3–36.0 of section B3–35.0, where no such action finds any warrant in fact or in law or is within the province of this court. It makes the right of an employee of voluntary retirement from the retirement system, as written into the

statute, an illusion and nullifies completely the legislative purpose of section B3–36.0 and the section as written.

The right of Eberle to be retired for service and to the designated retirement allowances and pension could not be defeated by the order of the Municipal Civil Service Commission terminating his city service on charges. If anything more were necessary to demonstrate that the conclusion which I have reached is correct, it is found in the construction which the Board of Estimate itself has placed upon the section relating to voluntary retirement for service. By rule 58 of the Board it is provided that "the rights of an applicant to retirement shall not be forfeited by separation from service or other change in status subsequent to the filing of an application for retirement, but he shall not be credited with any subsequent time to his separation from service."

Appellants' claim that the petitioner's proper remedy was by a proceeding for reinstatement cannot be sustained in view of the above. The petitioner is asking for retirement and a pension and if he obtained restoration to the service and remained in the service he could not have the retirement allowances to which he is entitled after reaching the retirement age, after forty-three years of continuous city service.

The orders should be affirmed, with costs.

LEHMAN, Ch. J., LOUGHRAN, LEWIS and DESMOND, JJ., concur with FINCH, J.; RIPPEY, J., dissents in opinion; CONWAY, J., taking no part.

Orders reversed, etc.